UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE E. HARPER, Jr.,

                    Plaintiff,              Civil Action No. 19-11106

v.                                          George Caram Steeh
                                            United States District Judge

DAVID ARKESTEYN, ADRIANE
FOSTER, BRENDA STEVENSON,                   David R. Grand
KELECHI EGBUCHULAM, RACHEL                  United States Magistrate Judge
THOMPSON, MICHAEL EAGIN,
MELISSA JENNINGS, JEROME
WARFIELD SR., SUE BROWN-WARD,
BRIAN SHIPMAN, AND ANTHONY
KING,

                    Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 67)

This case is on remand from the Sixth Circuit Court of Appeals. (ECF No. 14).

Plaintiff Willie E. Harper, Jr. ("Harper"), an incarcerated person, brings this action

pursuant to 42 U.S.C. § 1983, alleging, principally, that after he began serving a prison

sentence on a non-sex crime conviction, he was improperly classified as a sex offender,

and required to complete sex offender programing to be eligible for parole, in violation of

his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

More specifically, Harper claims he was entitled to an administrative hearing regarding his

classification, but was never given one, in violation of his procedural and substantive due

process rights. He also claims that requiring him to take sex offender programming without

first providing him an administrative hearing violates his Fifth Amendment rights against self-incrimination because his eligibility for parole is conditioned on his admitting to prior alleged criminal conduct for which he has not been convicted.  The defendants – David Arkesteyn, Adriane Foster, Brenda Stevenson, Kelechi Egbuchulam, Rachel Thompson, Michael Eagin, Melissa Jennings, Jerome Warfield, Sr., Sue Brown-Ward, Brian Shipman, and Anthony King (collectively, "Defendants") – are Michigan Department of Corrections ("MDOC") and Michigan Parole Board ("Parole Board") employees who Harper contends were involved, in one way or another, with his allegedly improper classification, assignment to sex offender treatment, and denial of parole.

Presently before the Court is Harper's motion for partial summary judgment filed on November 8, 2021.  (ECF No. 67).[1]  Defendants filed a response on December 6, 2021, and Harper filed a reply on December 20, 2021.  (ECF Nos. 71, 75).  On February 4, 2022, the Court held oral argument.  With the Court's permission, Defendants then filed a supplemental response, Harper filed a supplemental reply, and Defendants filed a supplemental sur-reply.  (ECF Nos. 92, 93, 99).  Thereafter, the Court again held oral argument on April 27, 2022.  The Court then permitted Defendants to file a final supplemental brief, to which Harper filed a supplemental response.  (ECF Nos. 102, 103).

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Harper's Motion for Partial Summary Judgment **(ECF No. 67)** be **DENIED.**

---

[1] Pursuant to 28 U.S.C. § 636(b), this case has been referred to the undersigned for al pretrial purposes.  (ECF No. 49).

II.    **REPORT**

A.    **Factual Background**

1.    **Harper is Charged with Sex Crimes, Home Invasion, Felonious Assault, and Domestic Violence, But Pleads Guilty Only to the Non-Sex Crime Charges**

On August 13, 2017, Harper was charged in state court with six counts of Criminal Sexual Conduct 3rd Degree (the "CSC Charges"); one count of Home Invasion 1st Degree; one count of Felonious Assault; and one count of Domestic Violence.  (ECF No. 92, PageID.897).  Pursuant to a plea agreement, prosecutors agreed to drop the CSC Charges and felonious assault charge in exchange for Harper pleading guilty to the home invasion and domestic violence charges.  (*Id.*, PageID.898; ECF No. 63, PageID.402; ECF No. 77-3, PageID.776-77).[2]

At the plea hearing in January 2018, Harper pled guilty to the home invasion and domestic violence charges that occurred on August 13, 2017, at the home of the victim, LaDawna Paul, located at "20166 Northlawn, in the city of Detroit."  (ECF No. 73-3, PageID.629-31).  Of note, the CSC Charges, which were dismissed pursuant to the plea agreement, relate to an incident that allegedly occurred later that same day at a different address – "9901 Wyoming, at Apartment 12, in the city of Detroit."  (*Id.*).

Following the plea, the Probation Department drafted a Presentence Investigation

---

[2] As Harper correctly notes, his "'verified' second amended complaint carries the same weight as would an affidavit for purposes of summary judgment."  (ECF No. 67, PageID.471; *see* ECF No. 63, PageID.419).  *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (explaining that where a party files a verified complaint, the allegations contained therein have the same force and effect as an affidavit for purposes of summary judgment).

("PSI") report.  (ECF No. 73-2).  A portion of the PSI labeled "Agent's Description of the

Offense" states as follows:

> The following information was garnered from the Detroit Police
> Investigator's Report dated 08/23/2017:
>
> On August 13, 2017, the complainant, LaDawna Paul, age 38, walked
> into the 2nd Percent [sic] to report that she had been sexually assaulted
> by the defendant, Willie Edward Harper Jr., whom she had filed a report
> on earlier that day.  The complainant stated she left her home, driving
> her car, in search of the defendant after he had broken into her home,
> stole her phone, and physically assaulted her.  The complainant located
> the defendant [].  . . . She and the defendant began to fight over her keys
> as she tried to leave.  The defendant managed to get the keys from her
> and then drove the complainant's car without her permission, taking her
> to his apartment at 9901 Wyoming, Apt 12.  The complainant stated
> once there the defendant parked in the rear of the building and forced
> her to go inside and she complied because he still had the knife.  Once
> they got inside his apartment, the complainant stated the defendant
> asked her for sex and she expressed that she was not in the mood and
> didn't want to and the defendant lifted her dress and began performing
> oral sex putting his mouth on her buttocks, cunnilingus (mouth on
> vagina), and then penis to vagina intercourse.  These sexual acts took
> place a second time after the complainant tried to leave and the
> defendant again took her car keys and forced her to go back upstairs to
> his apartment.  The complainant states she was allowed to leave around
> 8:45 p.m. and she drove straight to the 2nd Percent [sic] to report the
> sexual assault.  The complainant then went to Sinai Grace Hospital for
> treatment and Wayne County Safe for a Sexual Assault Kit.
>
> The defendant was originally charged with Criminal Sexual Conduct
> 3rd Degree (Force or Coercion) (6 counts), Home Invasion 1st Degree,
> Assault with a Dangerous Weapon (Felonious Assault) and Domestic
> Violence.  On 1/12/2018, he pled guilty to Home Invasion 1st Degree
> and Domestic Violence [].

(ECF No. 73-2, PageID.612-13).

At sentencing in state court before Judge Bruce Morrow on January 30, 2018,

Harper's counsel represented that they "review[ed] the presentence investigation report"

and there were "a couple corrections of note [Harper] wanted to have made," none of which involved the description of the offense. (ECF No. 77-3, PageID.773-75). Harper's counsel confirmed that "[t]hose are the only corrections, additions or deletions to the report that [Harper] wanted to have made []." (*Id.*, PageID.776).

Harper acknowledges that the PSI's description of his offense complies with Mich. Ct. R. 6.425(A)(b), which requires "a complete description of the offense and the circumstances surrounding it." (ECF No. 92, PageID.1030). But his position is that the agent's description of the offense "doesn't make [it] true," and that he "did not commit that [sex] crime." (*Id.*; *see also id.,* PageID.1025 ("So, Mr. Harper, I understand that you recognize that the Agent's Description of the Offense is the opinion of the probation officer who wrote the report and does not necessarily indicate what actually happened.")). Rather, Harper testified that he did not perform any "sexual acts" at all with the victim on August 13, 2017. (ECF No. 92, PageID.1025-26). Harper "didn't feel the need to challenge the PSI" at sentencing because his counsel and the prosecutor "had already worked out a plea deal, so therefore the PSI was irrelevant," and he was not told or aware that the MDOC would use his PSI to make classification decisions. (*Id.*, PageID.1026-27, 1034-35).[3]

---

[3] Harper later "challenged the PSI once [he] found out that the Defendants in this case illegally and unlawfully used that report against me." (ECF No. 92, PageID.1027). Specifically, starting on July 16, 2018, Harper began filing motions in state court for Judge Morrow to amend his PSI to change the agent's description of the crime to reflect only his home invasion and domestic violence convictions. (*Id.*, PageID.1035). Judge Morrow denied these motions based on Mich. Ct. R. 6.425, which "clearly states it accurately reflects what took place as far as the crime and circumstances surrounding it." (ECF No. 92, PageID.1035).

### 2.  MDOC's Screening and Classification of Harper Results in a Recommendation for Michigan's Sex Offender Programming

After sentencing, Harper was sent to the Charles Egeler Reception & Guidance Center ("RGC") in Jackson, Michigan.  (¶10).[4]  The MDOC does not formally classify or label prisoners as "sex offenders."  (ECF No. 77-2, PageID.705).  Nonetheless, the MDOC is "legally required" to follow Evidence Based Practices ("EBP") for targeting criminal behaviors.  (ECF No. 92, PageID.890).  Among other EBPs, the MDOC uses the Sex Offender Risk Assessment ("SORA"), which utilizes two risk assessment instruments: "Static-99-R" and "Stable-2007."  (ECF No. 77-2, PageID.707).  MDOC Operating Procedure 05.01.100 defines Static-99-R as "[a]n actuarial risk assessment instrument designed for use with adult male sex offenders."  (*Id.*, PageID.726).[5]  It also defines the Stable-2007 as "[a] dynamic risk instrument designed for use with adult male sex offender prisoners [] to measure areas of dynamic risk."  (*Id.*).  The Static-99-R is also used "in combination" with the Stable-2007 to assess an individual's relative risk and density of criminogenic needs to determine recommended treatment program intensity and duration.  (ECF No. 92, PageID.890).  "Although the MDOC does not screen prisoners using the

---

[4] Standalone citations to "¶__" are to Harper's second amended complaint, found at ECF No. 63.

[5] Static-99-R is the "most widely used assessment tool among correctional professionals in the United States" for estimating "relative risk of problematic sexual behavior based on objective historical facts," and "was found to have moderate predictive accuracy in 63 peer-reviewed studies [with] a 95% confidence rate."  (ECF No. 92, PageID.888-89, 892).  "Research supports the use of the Static-99-R assessment tool to identifying an adult male who has engaged in sexually abusive behavior risk [] to engage in further sexually abusive behaviors."  (*Id.*).  Importantly, the historical information used to score the Static-99-R is obtained from a prisoner's PSI, police reports, probation or parole violation reports, and any other official criminal justice information.  (*Id.*).

Static-99-R unless there is some indication of prior sexually problematic behavior, *a person can be determined to be at risk for future problematic sexual behaviors without a determination that they have ever committed a sex offense*." (*Id.* at 889-90) (emphasis added).

While the term "sex offender" does not appear anywhere on the Static-99-R form, prisoners who are screened using the Static-99-R and receive an initial risk score of IVa (which indicates an "above average risk of engaging in further sexually abusive behaviors") are recommended to participate in programming that addresses problematic criminal and sexually abusive behaviors. (*Id.*, PageID.892-93; ECF No. 77-2, PageID.713-14). The MDOC programming that addresses problematic sexual behaviors is currently called the Michigan Sex Offender Program ("MSOP"). (*Id.*, PageID.893).

According to the MDOC's website, the MSOP's mission is to provide "effective, efficient, research driven sex offender treatment *to offenders with current sex offense convictions and histories of sexual offending*," and "[o]f central importance is decreasing the risk of sexual *re-offense* which is achieved through," among others, "[u]tilizing empirically-based and validated assessment tools *developed specifically for sex offenders.*" (ECF No. 93-5, PageID.1089) (emphasis added). "Prisoners who enter the [MSOP] will learn different techniques in programming to alter thinking and behaviors so they can live in a healthy lifestyle upon reentry into society." (*Id.*).

On February 8, 2018, Mara Schneider completed a Static-99-R assessment of Harper by relying "on information contained in the PSI," which resulted in a "raw score" of 4 points and an initial risk score of IVa. (ECF No. 92, PageID.892). Notably, the Static-

99-R assessment checks "Yes" for "Prior Non-Sexual Violence – Any Convictions," but "None" for both "Prior Sex Offenses – Charges" and "Prior Sex Offenses – Convictions." (ECF No. 77-2, PageID.714).

Shortly thereafter, on February 14, 2018, defendant Egbuchulam, a MDOC Classification Director, used the MDOC's Assaultive Risk Screening Sheet to determine Harper's "Assaultive Risk Category."  (ECF No. 92, PageID.1038).  Based in part on a finding that Harper's "Crime Description Fits [] Sex Assault," Harper was assessed as a "High Assault Risk."  (ECF No. 92, PageID.1038).  Harper first verbally objected to being classified based on a "sexual assault" because he has "neither been convicted of nor has he ever engaged in any sexual assault in his entire life."  (¶13).  Despite his objections, Egbuchulam explained to Harper that "his crime for which he was convicted fits the description of a sexual assault."  (¶14).

On February 15, 2018, Egbuchulam provided Harper with a written MDOC Notice of Risk Classification as a "High Assaultive Risk," which, again, was based in part on the "Crime Description Fits – Sex Assault" finding.  (ECF No. 46-2, PageID.293) (the "Notice").  The Notice further reflects that "[t]he Parole and Commutation Board will also be notified of this classification, and although the Parole and Commutation Board looks at many other factors as well as risk in making each decision, it may deny or delay parole." (*Id.*).  The Notice appears to advise inmates of a right to an administrative hearing to challenge their classifications.  Specifically, the Notice states, "If you believe these statements about your background are inaccurate, you should see your counselor, resident unit manager, or supervisor.  If you are still dissatisfied after that, you may request an

administrative hearing pursuant to MCLA 791.251 *et seq* to contest the basis for the classification factors applied." (*Id.*).  It further specifically allows the inmate to "request an administrative hearing so that [he] can present information concerning this matter," and even gives the inmate "a right to have a hearing investigator assigned to help [] prepare for [his] hearing." (*Id.*).[6]

On February 16, 2018, Harper requested an administrative hearing after contesting, in writing, the basis for his classification, arguing that the statements used for his classification "are inaccurate because no sexual assault occurred.  The agent description of the crime was based upon a police report fabricated by the victim that falsely accused me of a sexual assault.  Furthermore, my classification should have been based on the final charge." (*Id.*).  He also requested a hearing investigator. (*Id.*).  Despite his requests, Harper never received an administrative hearing. (¶15).

### 3.  Harper Refuses to Participate in MSOP

#### a.  Muskegon Correctional Facility

Harper was transferred to Muskegon Correctional Facility ("MCF") where he met with MCF's Classification Director, "Mr. Kitchens," who advised Harper that "a reclassification could not occur because [] Egbuchulam had already made the

---

[6] MCLA 791.251(2)(e) provides, "[e]xcept as otherwise provided in this section, the hearings division is responsible for each prisoner hearing the department conducts that may result in the loss by a prisoner of a right, including but not limited to … High [] assaultive risk classifications." In turn, MCLA 791.252 provides that for "each prisoner hearing conducted pursuant to [Section 251(2)]," the parties (among other protections) "***shall be*** given an opportunity for an evidentiary hearing without undue delay;" "***shall be*** given reasonable notice of the hearing;" and "***shall be*** given an opportunity to present evidence and oral and written arguments on issues of fact."  MCLA 791.252(a), (b), (d) (emphasis added).

classification." (¶¶19-20). Instead, Harper was told to file a grievance against defendants Arkesteyn and Foster, who were the MCF employees responsible for implementing Egbuchulam's classification decision and facilitating Harper's placement in the MSOP. (*Id.*). Harper filed a grievance challenging Arkesteyn's and Foster's efforts to place him in the MSOP, despite the fact that he had not been convicted of a sex crime nor accused of any sexual wrongdoing while incarcerated. (¶21).

Sometime in March 2018, Harper met with Foster to again challenge his placement in the MSOP, but Foster told him that she and Arkesteyn "correctly classified him as a sex offender for purposes of needing to participate in the MSOP," "reiterated that [their] decisions were based upon Egbuchulam's prior assessment and a presentence report contained in [Harper's] prison file," "articulated [their] 'recommendations' that [Harper] partake in sex offender therapy programming," and "reaffirmed that the Parole Board would be made aware of [their] assessments." (¶22).

On April 28, 2018, as a result of his grievance against Arkesteyn and Foster, Harper met with defendant Stevenson, who was a Unit Chief Psychologist. (¶23). Stevenson affirmed Harper's classification "based, in part, on an alleged sex offense that never occurred," and explained that Harper was "properly designated as a sex offender based upon language contained in [his PSI] and a Static-99 form utilized by [] Egbuchulam, Arkesteyn[,] and Foster." (¶23). Harper continued to voice his objections to being labeled a sex offender and his placement in the MSOP, and he filed another grievance. (¶26). Harper testified that the MCF staff did not call him a "sex offender" nor tell other inmates that he was a "sex offender." (ECF No. 92, PageID.930, 934).

### b. *Bellamy Creek Correctional Facility*

On June 5, 2018, Harper was transferred to Bellamy Creek Correctional Facility ("IBC"), and on July 3, 2018, he was placed in Housing Unit 6 ("Unit 6"), which is a location "specially designated for sex offenders." (¶¶ 26-27; *see* ECF No. 1, PageID.24; ECF No. 77-2, PageID.708). All inmates in Unit 6 were "there for MSOP," which takes place in that unit. (ECF No. 92, PageID.944). All of the officers and inmates knew Unit 6 as the "sex-offender unit." (*Id.*, PageID.944). Harper was placed into MSOP, which included a program requiring 25 sessions. (¶28). When he objected to his classification to defendant Thompson, his Resident Unit Manager, Thompson responded that the PSI "controlled the situation," stated Harper was a "sex offender," and told him all sex offenders are "housed in housing unit 6." (¶27; ECF No. 1, PageID.24 (MDOC investigation summary of a Step I grievance response form, which states, "During my investigation of this grievance I interviewed PC Thompson and ***she stated she did say Harper is a sex offender and all sex offenders are housed in housing unit 6***.") (emphasis added). Harper testified that Thompson and another MDOC employee named Ron Wright also called him a "sexual predator" or "predator." (ECF No. 92, PageID.952).

On the day Harper entered the first phase of the MSOP,[7] known as the Treatment Readiness for You ("TRY") program, Ms. Emily A. Minnick from MDOC's Health Care Services informed him that "as part of [his] initial beginning instruction," he had to "admit that [he] committed the sexual assault in [his] PSI." (ECF No. 92, PageID.952-53). During

---

[7] The MSOP is administered in five phases. (ECF No. 92, PageID.952).

the TRY program, participants sat in a semi-circle, and then "they say what they did" and talked about crimes they "committed against children and women."  (*Id.*, PageID.962). While Harper was present on the first day, he "declined to participate sharing 'I wasn't convicted of a CSC[.]'"  (ECF No. 77-2, PageID.763; *see also* ECF No. 92, PageID.952 (indicating Harper responded that he "did not commit no sexual assault on [his] victim."). Harper stated that he "couldn't take it no more" and was terminated after one day in the TRY program for declining to participate.  (*Id.*, PageID.962, 964).

MDOC records list August 30, 2018, as the date Harper was "terminated" from the program.  (ECF No. 77-2, PageID.720, 763; ECF No. 93-4, PageID.1087).  A "Therapy Non-Admission Report" completed by Minnick reflects the "Specific Reason(s) for [Harper's] Nonadmission" as "not interested in program participation" and explains that "Mr. Harper was screened today for TRY.  He declined to participate sharing 'I wasn't convicted of a CSC.'  Mr. Harper may kite for reconsideration in 3 months."  (ECF No. 77-2, PageID.763).  Harper alleges that, despite his refusal to participate in sex offender therapy, repeated objections to his classification, and "termination" from the MSOP on August 30, 2018, he was required to reside at IBC in a "sex offender unit" for approximately a year. (¶¶28-29).  Defendants dispute this point via an affidavit from Parole Board Chairman Brian Shipman, which attests that "MDOC housed Harper in a unit comprised of other prisoners also participating in sexual offender programming only once: from July 3, 2018, to November 22, 2018, while Harper was incarcerated at [IBC] and when Harper was enrolled in sexual offender programming. ... At no time since has MDOC housed Harper in a 'sex offender' unit."  (ECF No. 77-2, PageID.708).  Harper contends

that while he always maintained his refusal to participate in the MSOP, some inmates in his unit who had initially refused to participate in that program "[e]ventually [] broke and [] participated."  (ECF No. 92, PageID.955).

Harper contends that the MSOP unit at IBC had different rules than other units. (ECF No. 92, PageID.955-56).   For example, that unit was not allowed to have pornography and was more lenient toward "wide open" homosexual activity.   (*Id.*, PageID.956-58).   Moreover, inmates in MSOP units would talk about their crimes, and Harper testified that it was "hell every day he was there" to have to "see and hear what they did to children and women." (*Id.*, PageID.961).   In the "day room," inmates would also sit and talk about the "violence wheel," which was their "homework assignment" to discuss "what they did to their victims," and Harper "would have to sit there an[d] listen to them." (*Id.*, PageID.962-63).

At IBC, sex offenders and non-sex offenders share the same "yard time."   (*Id.*, PageID.966).  Every day that Harper and the rest of Unit 6 – otherwise known as the "sex unit" – entered the yard, the other prisoners would say, "Here come the chomos," which is short for "child molesters." (*Id.*, PageID.941, 967).  Because "sex offenders are the bottom hierarchy of the penal institution, of the prison," everything that happens, including assaults, are "[w]ay more intensified in the MSOP unit."  (*Id.*, PageID.975).

      c.  *St. Louis Correctional Facility or Central Michigan Correctional Facility*

The record is somewhat unclear where Harper was transferred to after IBC.  Harper testified that he was transferred to the St. Louis Correctional Facility ("SLF") and "again

put in the sex offender unit, Alpha Unit." (ECF No. 92, PageID.968). Defendants present an affidavit from the Central Michigan Correctional Facility ("STF") Warden's administrative assistant Jamie Badgerow, attesting that MDOC records indicate Harper was housed in the "R Unit" (which "has never been a [MSOP] Unit") of STF from December 19, 2019, until January 28, 2020. (*Id.*, PageID.1043) (emphasis added). Badgerow further attests that "Units L, M, N, and P were the only MSOP Units" at STF. (ECF No. 92, PageID.1043).[8]  In any case, it is undisputed that Harper objected to being recommended for MSOP and refused to participate in any MSOP programming while at SLF and/or STF. (¶30; ECF No. 92, PageID.976).

### d. *G. Robert Cotton Correctional Facility*

Harper was then transferred to the G. Robert Cotton Correctional Facility ("JCF") in early February 2020, where he currently resides and continues to refuse to participate in any sex offender therapy. (¶31). Upon his arrival, his "counselor" told him that he "required MSOP programming." (ECF No. 92, PageID.977). Although he was not placed in a "MSOP unit" at JCF, Harper testified that "the majority of the people in [his] unit [] are sex offenders" based on what "the inmates told [him]." (*Id.*, PageID.976-77). At JCF, the correctional officers have not treated him differently based on his MSOP recommendation. (*Id.*, PageID.981). However, Harper alleges that as a consequence of

---

[8] In his supplemental reply brief, Harper notes that Defendants disagree as to what facility and/or unit Harper was placed in MCF, SLF, and/or STF, but argues that, "[r]egardless, Defendants admit that Harper was assigned to a sex offender unit for MSOP therapy at [IBC]." (ECF No. 93, PageID.1059 n.1). At oral argument on April 27, 2022, Harper's counsel represented that he was not sure if IBC was the only facility in which Harper was housed in a MSOP unit, but that Harper was "definitely" placed in a MSOP at IBC.

being labeled as a sex offender he is ineligible for minimum custody classification and, thus, ineligible for certain work release and community custody programs.  (¶32).

### 4.  Parole Board Denies Parole for the First Time on February 3, 2020

Pursuant to MCL 791.234, an inmate is "eligible for parole when the inmate has served a period of time equal to the minimum sentence imposed by the court for the crime of which he was convicted, less good time and disciplinary credits."  (¶33).  Harper has already served his minimum sentence.  (¶34).  Questions regarding potential MSOP programming are assessed and recommended by MDOC's Health Care Services.  (ECF No. 99, PageID.1257).  The Parole Board observes the recommendations of Health Care Services and may decide to parole a prisoner without completing the recommendation, but the Parole Board does not make or remove the recommendation itself.  (*Id.*).

Harper was denied parole for the first time on February 3, 2020, "without an interview."  (¶34; ECF No. 92, PageID.996).  He received a notice of denial through the mail.  (ECF No. 92, PageID.982-83).[9]  Defendant Brown-Ward, in her capacity as a Parole Board analyst, reported to the Parole Board that Harper had a prior sex offense, which was untrue, and that he refused "recommended" sex offender therapy programming.  (¶35).

Harper objected, in writing, to the Parole Board's denial of his parole, challenging his "sex assault" classification by Egbuchulam, Arkesteyn, and Foster, who supplied the initial determinations that led to the -5 mental health score utilized by Brown-Ward.  (¶37).

---

[9] Harper testified that the notice of denial was "misleading" and full of "wordplay," and that the "truth of the matter" is that the Parole Board did not parole him because he did not complete MSOP.  (ECF No. 92, PageID.985-99).

On March 11, 2020, Brown-Ward issued the following written response:

> You received the -5 mental health score based upon your present conviction. A history of, OR, currently serving on, a CSC conviction for [sic] sexually related crime is included in the PG scoring process for mental health points. Your crime description clearly notes a sexual assault on your victim. A sexual assault is included on the PG scoring process for mental health points. I would like to encourage you to continue in any and all programming available to you [sic] [at] your current site.

(*Id.*). Moreover, Parole Board Chairman Shipman attests in an affidavit that the Parole Board "decided to continue Harper's prison sentence ***because he had received misconduct tickets that resulted in a security reclassification***, *and* he had not completed his recommended sexual offender programming." (ECF No. 77-2, PageID.709) (emphasis added). After being denied parole, Harper again refused to participate in the MSOP. (¶38).

### 5. Parole Board Denies Parole a Second Time on February 23, 2021

While the record is unclear as to the exact date, some "months" before the Parole Board's second parole decision one year later, Harper was interviewed by defendant King, a member of the Parole Board, who allegedly expressed doubts as to Harper about his fitness for release without participating in the MSOP. (ECF No. 92, PageID.996; ¶38). Harper claims this is because the Parole Board "employs an unwritten policy of denying parole to inmates who refuse to take 'recommended' sex offender therapy classes." (¶38). Specifically, Harper testified that King told him the "problem" was that the victim said Harper "did the [sex] crime," but Harper was saying that he "didn't do the crime." (ECF No. 92, PageID.996). Harper told King that "even though the allegation is there, it doesn't

16

make it true.  I did not commit that crime again[st] her.  I didn't, Mr. King," to which King responded, "Well, Mr. Harper, there's the problem."  (ECF No. 92, PageID.996).

Some "months" later, on February 3, 2021, the Parole Board considered Harper for parole, but issued a Notice of Action, which stated, "Following your recent parole consideration, the Parole Board has determined that additional information is necessary before reaching a final determination.  This information has been requested.  The final decision in your case will be delayed until this information has been received and reviewed."  (ECF No. 92, PageID.1045).  More specifically, the Parole Board requested a "current psychological evaluation" before making its final decision.  (*Id.*).

On February 11, 2021, pursuant to the Parole Board's request, Kevin Tolsma, the Mental Health Unit Chief of the Cooper Street Correctional Facility, completed a Stable-2007 assessment on Harper.  (ECF No. 77-2, PageID.715-18; ECF No. 92, PageID.1045).  Tolsma never told Harper that "this was a SORA evaluation," and only told him that the Parole Board "wanted a psychological evaluation."  (ECF No. 92, PageID.1002).  Had Harper known this was a sex offender reassessment, he would not have agreed to participate.  (*Id.*, PageID.995, 1002).  When Tolsma asked if he ever had a relationship over five years, Harper responded that he had been in a "10-year live-in romantic relationship."  (*Id.*, PageID.1003-04).  Harper received a score of 6 on his Stable-2007 assessment,[10] which indicated "a moderate density of criminogenic needs."  (ECF

---

[10] Harper's score of 6 is broken down as follows: 1 point for "Some Concern" with "Capacity for Stable"; 2 points for "Significant Concern" with "Hostility Toward Women"; 1 point for "Some Concern" with "Poor Problem Solving Skills"; and 2 points for "Significant Concern" with "Cooperation with Supervision."  (ECF No. 77-2, PageID.715-17).  Among other categories, he

No. 92, PageID.894).  Combined with Harper's 4 points from the Static-99-R, he had a

combined risk score of IVa, which again led to the continuation of his recommendation to

complete MSOP.  (*Id.*, PageID.894).

Harper was considered for, but denied, parole for a second time on February 23,

2021.  (¶38; ECF No. 92, PageID.992).  Importantly, in the "Parole Board Notice of

Decision," although the "Recommendations for Corrective Action which May Facilitate

Release" includes that Harper "[c]omply with any recommendation for . . . therapeutic

programming when referred,"[11] the listed reasons for denying him parole are unrelated to

his alleged sexual assault, his classification as a sex offender, or his failure to complete the

MSOP.  (ECF No. 77-2, PageID.768-69).  Indeed, in the section of the document entitled

"Reasons in Support of Parole Board Action" the Parole Board listed only the following:

(1) the property crime was "associated with violence" and involved "the presence of a

weapon(s)," "breaking and entering an occupied dwelling," and "the taking of a possession

of another; (2) "Regarding the crime, it is our belief [that] Prisoner minimizes their

responsibility"; and (3) a criminal history of violent misdemeanors including a weapon,

felony assaultive crimes, and traffic misdemeanors.  (*Id.*, PageID.768).

While the reasons provided in the notice for the parole denial appear unambiguous,

---

received 0 points for "No Concern" as to "Sex Drive Sex Preoccupation," "Sex as Coping Score,"
and "Deviant Sexual Preference."  (*Id.*).

[11] These "recommendations" also include that Harper: "Demonstrate responsible behavior by
earning positive reports in any programs you may be involved in"; "Demonstrate responsible
behavior by avoiding situations which result in misconduct citations"; and "Provide additional
demonstration of positive prison behavior during the period of continuance."  (ECF No. 77-2,
PageID.768-69).  The Parole Board notice states after the recommendations that "COMPLETION
DOES NOT GUARANTEETE A POSITIVE ACTION."  (*Id.*).

Harper urges the Court to essentially ignore that document and instead exclusively credit Shipman's affidavit, in which he avers that "[t]he second time the parole board considered Harper for parole … it decided to again continue [Harper's] prison sentence because he had not yet completed his recommended sexual offender programming," and that this decision "was made with a video interview of Harper and updated [SORA]."  (ECF No. 77-2, PageID.709).

### 6.  Parole Board Defers Decision on Third Opportunity for Parole

This case recently developed an usual twist.  In Defendants' supplemental brief filed on March 4, 2022, they admit Harper's risk score – the very one leading to a recommendation for MSOP, and later to Harper commencing this action – was incorrectly calculated.  Specifically, Defendants present an affidavit from James Kissinger, a State Administrative Manager in MDOC's Health Care Services, in which he attests:

> [] Harper's PSI did not contain any information about his prior history of living with a romantic partner for over two years.  [] A review of [] Harper's Static-99-R scoring sheet, his answers during his Stable-2007 assessment, and his February 22, 2022, deposition testimony reveals that he was incorrectly scored one point for never having lived with any intimate partner for at least 2 years.  Without scoring that point, [] Harper's Static-99-R score would be 3 points, indicating an initial risk score of III.
>
> * * * *
>
> Combination of the correct scoring of 3 points on [] Harper's Static-99-R with his Stable 2007 score of 6 points indicates a combined risk score of III, indicating an individualized sex offender risk assessment to determine if he should be recommended to participate in programming that addresses problematic sexual behaviors.  [] MDOC Sex Offender Services corrected the scoring error and updated [Harper's] programming recommendations to reflect the new combined risk score on or about March 1, 2022.

(ECF No. 92, PageID.893-94).   In a supplemental declaration, Kissinger attests that "[a]bsent any indication of new non-changeable, static risk factors or evidenced change to stable dynamic risk factors related to sexual recidivism by [] Harper that result in a new risk classification, he will not be recommended for [MSOP] by MDOC Mental Health Services." (ECF No. 99, PageID.1161).[12]

Defendants present supplemental declarations reflecting that "MDOC's Bureau of Health Care Services no longer recommends that he complete MSOP programming." (ECF No. 99, PageID.1258).   On March 15, 2022, Harper was interviewed by a "Parole Board member," and the Parole Board deferred its decision pending Harper's "participation in and completion of a batterer's intervention program." (*Id.*, PageID.1258; *see* ECF No. 103, PageID.1299).   On March 30, 2022, Harper was referred to the "Batterers Intervention program," also known as the Michigan Domestic Violence Program ("MiDVP").   (ECF No. 102, PageID.1284).   He was "activated" in MiDVP at JCF on April 26, 2022, scheduled to begin the program on May 2, 2022, and projected to complete that program on September 2, 2022.   (*Id.*).

## B.   Procedural Background

On April 16, 2019, Harper filed his initial complaint in this action *pro se*, alleging various constitutional claims arising out of his alleged misclassification.   The Honorable Arthur J. Tarnow dismissed the case *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) for

---

[12] The Court notes, however, that even at a score of III, it appears Harper *could* have been recommended for MSOP as part of the "individualized sex offender risk assessment" described in Kissinger's initial declaration.

failure to state a claim upon which relief may be granted.  (ECF No. 8).  Harper appealed

to the United States Court of Appeals for the Sixth Circuit, and on April 28, 2020, that

Court upheld the dismissal of many of Harper's claims, but remanded the case as to

Harper's Fourteenth Amendment procedural due process claim and his Fifth Amendment

self-incrimination claim.[13]  *Harper v. Arkesteyn*, No. 19-1928, 2020 WL 4877518 (6th Cir.

Apr. 28, 2020).

Just a few days after the Sixth Circuit issued its ruling, on May 1, 2020, Harper filed

a new *pro se* civil action in the Eastern District of Michigan, Case No. 20-11377.  In that

case, Harper named as defendants various Michigan Parole Board members, alleging,

among other claims, that they violated his procedural due process rights by not "remov[ing]

the sex offenders designation from [his] institutional file (and consequently, the

requirement that he complete MSOP)," and asked the Court to enter an injunction ordering

the Parole Board to remove that designation.  On February 22, 2021, in each of his two

cases, Harper filed motions to consolidate.  (ECF No. 38; Case No. 20-11377, ECF No. 8).

In the midst of all of this, Harper was assigned counsel in this case (ECF No. 31),

and filed his first amended complaint on March 29, 2021.  (ECF No. 41).  Defendants then

filed a motion to transfer venue, or alternatively to sever, and defendant Egbuchulam filed

a motion for summary judgment (ECF Nos. 44, 57), both of which were denied (ECF Nos.

58, 90).  On September 16, 2021, the undersigned subsequently granted Harper's motion

---

[13] The Sixth Circuit did not address arguments that Harper's alleged misclassification as a sex offender violated his *substantive* due process rights, given that "they are not properly before us because they were not raised before the district court."  *Harper*, 2020 WL 4877518, at *1.

to consolidate cases, and Case No. 20-11377 was consolidated into the instant case, Case No. 19-11106.  (ECF No. 59).

After consolidation, on October 12, 2021, Harper filed his operative second amended complaint against all Defendants.  (ECF No. 63).  On October 26, 2021, Defendants filed a motion to dismiss (ECF No. 66), and Harper filed the instant motion for partial summary judgment (ECF No. 67).  In response to Harper's summary judgment motion, Defendants argued that they needed to depose Harper before they could fully respond to that motion and, thus, simultaneously filed a Rule 56(d) motion for discovery.  (ECF Nos. 70, 71).  Harper then moved for a preliminary injunction "in the event" the Court granted Defendants' Rule 56(d) motion (ECF No. 73), and Defendants subsequently filed a motion for leave to depose Harper.  (ECF No. 78).

On February 4, 2022, the Court heard oral argument on the above motions.  Ultimately, the Court denied Defendants' motion to dismiss (ECF Nos. 84, 90), granted their Rule 56(d) motion for discovery and motion for leave to depose Harper (ECF No. 85), and denied Harper's motion for a preliminary injunction (ECF Nos. 86, 90).

On March 7, 2022, Defendants filed their supplemental response,[14] and on March 14, 2022, Harper filed his supplemental reply.  (ECF Nos. 92, 93).  After the Court granted Defendants' motion to file a short sur-reply, Defendants filed their supplemental sur-reply on March 30, 2022.  (ECF Nos. 94, 95, 99).  On April 27, 2022, the Court held oral

---

[14] Defendants filed a motion for leave to file excess pages for their supplemental response, in which they represent that Plaintiff's counsel was contacted and did not oppose.  (ECF No. 91, PageID.845).  Accordingly, Defendant's motion **(ECF No. 91) is GRANTED**.

argument on the supplemental briefing.  With the Court's permission, Defendants filed a supplemental brief on May 5, 2022, and Harper filed a supplemental response on May 11, 2022.  (ECF Nos. 102, 103).

### C.    Standard of Review

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children and Family Servs.,* 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether an issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex v. Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleading, nor "'rely on the hope that the trier of fact will disbelieve the movant's

denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).

Importantly, a moving party with the burden of proof at trial faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (noting that party with the burden of proof at trial "must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it."). Specifically, where "the moving party has the burden – the plaintiff on a claim for relief or the defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986) (internal citations omitted). Accordingly, summary judgment in favor of the plaintiff "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Harris v. Kowalski*, No. 1:05-CV-722, 2006 WL 1313863, at *3 (W.D. Mich. May 12, 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

### D.  Analysis

Primarily at issue in this case are a series of events that resulted in Harper, who was *not* convicted of a sex crime, being assessed as a "high assaultive risk," being recommended to participate in sex offender treatment in the form of MSOP, and allegedly facing several consequences based on that recommendation for, and his refusal to participate in, MSOP. Importantly, the genesis of these events stems from a portion of Harper's PSI describing not only his crimes of conviction, but his other charges on alleged sexual offenses that were dismissed as part of a plea agreement. As such, Harper claims

that Defendants unlawfully relied on his PSI's description of offenses that were dismissed to classify him as a sex offender *without* providing him with an administrative hearing to challenge that classification, forced him then to take MSOP and admit to alleged offenses for which he has not been convicted, and denied him parole based on his refusal to participate in the MSOP, in violation of his Fourteenth Amendment procedural and substantive due process rights, as well as his Fifth Amendment right against self-incrimination.

### 1. Mootness

Before addressing the merits of Harper's constitutional claims, the Court must first address Defendants' somewhat cursory argument that the case is moot:

> Plaintiff seeks injunctive and declaratory relief to prevent the Defendants from recommending that he complete MSOP.  As the Plaintiff has been reclassified after a scoring error was identified, it is no longer recommended that he complete MSOP.  This renders all prospective injunctive relief moot and Plaintiff's claims should be dismissed for a lack of jurisdiction.

(ECF No. 92, PageID.882).  Harper responds that "shaving one point off of [his] Static-99-R score [] simply affects the 'program variables' section of Harper's Parole Guidelines Scoresheet.  It has no effect on the -5 mental health score and Kissinger cannot control parole board policy, directive, or future decisions."  (ECF No. 93, PageID.1080).  He also suggests that the timing of this correction "has a scent of corruption" and "gamesmanship."  (*Id.*, PageID.1080).

"The issue of mootness implicates the court's subject matter jurisdiction inasmuch as federal courts are limited by Art. III of the Constitution to deciding cases and

controversies." *Mosley v. Hairston*, 920 F.2d 409, 414 (6th Cir. 1990). Only "live" controversies which persist in "definite and concrete" form even after intervening events have altered the parties' circumstances satisfy this requirement. *Id.* (citing *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974). A defendant's "voluntary cessation of a challenged practice" does not automatically moot a case. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008). Rather, a claim is only moot where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quotation omitted). The "heavy burden" of persuading the court that the challenged conduct cannot be reasonably expected to start up again lies with the party asserting mootness. *Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003)

Here, the operative complaint makes clear that, as part of his requests for declaratory and injunctive relief, Harper seeks in part to "remove and expunge [his] current classification in all MDOC paperwork, files and computer systems," "***expunge all Parole Board paperwork, files and computer entries that mention or rely upon the existing -5 mental health score used in Defendants' Parole Board's Scoresheet***," and "[r]equire Defendants … to provide [him] an expeditious Parole Board rehearing wherein Defendants will be ***enjoined from using*** Plaintiff's current sex offender classification [], his ***existing - 5 mental health score or [his] past refusals to participate [in] sex offender therapy programming*** as a basis to evaluate his current eligibility for parole." (ECF No. 63, PageID.417-18) (emphasis added). Defendants, as the party asserting mootness, do not argue, much less present evidence, that they have expunged all relevant paperwork and files related to Harper's classification, mental health score, and recommendation for

MSOP, nor that the Parole Board will not use his past refusals to participate in MSOP as a basis to evaluate his parole eligibility.[15]

Indeed, during oral argument, Harper presented a MDOC "Parole Eligibility / Lifer Review Report" reflecting that references to the MSOP have not been expunged from relevant documents, as the document notes "MSOP" was "waived" on March 1, 2022, and that Harper "has completed most programming minus MSOP" and "[h]as not completed MSOP due to refusal/decline."  (ECF No. 100, PageID.1265-66).  He also presented a MDOC "Parole Guidelines Scoresheet," which reflects that, as of March 2, 2022, Harper continues to be assessed a Mental Health Score of "-5."  (ECF No. 100, PageID.1263).

For all of these reasons, Defendants failed to meet their heavy burden of showing that their recent removal of a MSOP recommendation renders Harper's claims for injunctive and declaratory relief moot.  *See Toney v. Owens*, 779 F.3d 330, 334 n.8 (5th Cir. 2015) (holding that deletion of designation for pending sex therapy assignment after discovering inmate was misclassified did "not render [inmate's] claims for injunctive and declaratory relief moot.").

### 2.  Fourteenth Amendment Procedural Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall

---

[15] Kissinger's supplemental declaration merely states that Harper will not be recommended for MSOP "[a]bsent any indication of new non-changeable, static risk factors or evidenced change to stable dynamic risk factors related to sexual recidivism by Prisoner Harper that result in a new risk classification."  (ECF No. 99, PageID.1161).  In other words, Defendants acknowledge that "any" new "indication" or "change" to "risk factors" might result in another recommendation for MSOP. Moreover, Kissinger's initial declaration suggests that even at a score of III, Harper *could* have been recommended for MSOP as part of the "individualized sex offender risk assessment" applicable to such scores.

"deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  This clause has both a procedural and substantive component.  *EJS Prop., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012).  "Procedural due process is traditionally viewed as the requirement that the government provide a 'fair procedure' when depriving someone of life, liberty, or property; substantive due process 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.'"  *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

As for procedural due process, a prisoner can be deprived of his liberty such that due process is required in two contexts: (1) when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court; or (2) when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484–87 (1995).

The Sixth Circuit has already explained these principles vis-a-via Harper's procedural due process claim, noting that it is "the stigmatizing consequences of being labeled a sex offender, ***when coupled with mandated behavioral modification therapy***, [that] constitute[] the kind of deprivation of liberty that requires procedural protections":

> This circuit has not addressed the question of whether a person has a liberty interest in not being classified as a sex offender.  But other circuits that have considered the issue have held that prisoners do have such a liberty interest. *See Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010) (holding that prisoners have a liberty interest in not being

28

labeled as a sex offender and forced into treatment, and thus are entitled to adequate process before prison officials take such action); *see also Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999) (per curiam) (holding that a convicted attempted murderer "retains a 'residuum of liberty' that would be infringed by classification as a sex offender without complying with minimum requirements of due process") (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)); *Neal v. Shimoda*, 131 F.3d 818, 829–30 (9th Cir. 1997).

*Harper*, 2020 WL 4877518, at *3 (emphasis added).  Accordingly, this Court's analysis of the issue takes some brief unpackaging of caselaw relevant to Harper's claim that his classification as a sex offender, ***coupled with mandated MSOP***, triggered a liberty interest from the Due Process Clause itself requiring procedural protections.

### a. Relevant Caselaw

In *Vitek*, the U.S. Supreme Court held unconstitutional a Nebraska statute authorizing the involuntary transfer of inmates to a mental hospital without a hearing if it was determined that the inmate suffered from a mental illness that could not be properly treated in prison.  *Vitek*, 445 U.S. at 483-86, 494.  The Supreme Court based this holding, in part, on a violation of a state-created liberty interest where the statute created an "objective expectation" that a prisoner would not be transferred unless he suffered from a mental illness that the prison could not adequately treat.  *Id.* at 489-90.  But additionally, and important to Harper's case, the Supreme Court held that the involuntary transfer to a mental hospital ***along with mandatory treatment*** for mental illness violated a liberty interest, separate and apart from the state statute, that was protected by the Due Process Clause itself: "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, ***coupled with the subjection of the prisoner to***

***mandatory behavior modification*** as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." *Id.* at 491-94 (emphasis added). The Supreme Court made clear that:

> None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. … A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they ***do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment*** without affording him additional due process protections.

*Id.* at 493-94 (emphasis added).

In *Neal*, the Ninth Circuit confronted Hawaii's sex offender program, which labeled inmates as sex offenders and required its completion as a precondition for parole eligibility. *Neal*, 131 F.3d at 818, 822. Inmate Neal, who was not convicted of a sex offense but classified as a sex offender based on the indictment and PSI, refused to complete the program. *Id*. The Ninth Circuit held that it could "hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender," and that "the stigmatizing consequences of the attachment of the 'sex offender' label coupled with the subjection of the targeted inmate to a mandatory treatment program whose successful completion is a precondition for parole eligibility create the kind of deprivations of liberty that require procedural protections." *Id.* at 829-30.

In *Kirby*, the Eleventh Circuit held that Alabama's classification of inmate Edmond, who was convicted of attempted murder, as a sex offender based on two prior sex-related

offense charges listed in his PSI implicated a liberty interest under the Due Process Clause. *Kirby*, 195 F.3d at 1288. That court determined that Edmond had "a liberty interest in not being branded a sex offender" and "the stigmatizing effect of being classified as a sex offender constitutes a deprivation of liberty under the Due Process Clause," so "an inmate who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender." *Id.* at 1292.[16]

In *Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004) ("*Coleman I*"), the Fifth Circuit held that requiring a prisoner to register as a sex offender and participate in therapy as a condition of supervised release triggered a liberty interest. Inmate Coleman, who had not been convicted of a sex offense, was released from prison on mandatory supervision with conditions requiring him to register as a sex offender and attend sex offender therapy. *Coleman I*, 395 F.3d at 219. He was never given notice of an opportunity to contest these conditions, and when he failed to participate in therapy, his parole was revoked. *Id.* The Fifth Circuit agreed with the Ninth and Eleventh Circuits "that prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions." *Id.* at 222. It determined that this case was "materially indistinguishable from *Vitek*," and because the "highly invasive nature" of Texas' sex offender therapy program made it "qualitatively different from other conditions which may attend an inmate's release," Coleman had a "liberty interest in

---

[16] The Eleventh Circuit also noted that "[a]s a consequence of being classified as a sex offender, Edmond must participate in group therapy sessions of Sexual Offenders Anonymous as a prerequisite for parole eligibility." *Id.* at 1288.

freedom from the stigma and compelled treatment on which his parole was conditioned" that required some procedural protections. *Id.* at 223.

Finally, in *Renchenski*, the Third Circuit held that Pennsylvania's labeling of inmate Renchenski, who was sentenced to life without the possibility of parole for murder but neither charged nor convicted of a sex crime, as a sex offender and compelling him to submit to sex offender treatment triggered an independent liberty interest under the Due Process Clause. Due to his classification, Renchenski was enrolled, but refused to participate, in a sex offender program, which subjected him to "substantial penalties, including the loss of his prison job, assignment to disciplinary custody for ninety days, cell restriction for thirty days, suspension of the right to receive visitors, and loss of privileges such as access to television, radio, and the commissary." *Renchenski*, 622 F.3d at 323. The Third Circuit held that not only was a sex offender label "severely stigmatiz[ing]," but that "because Renchenski was convicted of murder and his punishment is predicated upon that conviction, sex offender treatment is not one of the conditions of confinement that his sentence imposes upon him. In turn, compelled treatment, i.e., sex offender therapy, changes the conditions of Renchenski's sentence and, accordingly, constitutes a loss of freedom from liberty that exceeds his loss of freedom from confinement." *Id.* at 326-27.[17]

---

[17] *See also, Chambers v. Colorado Dep't of Corrs.*, 205 F.3d 1238 (10th Cir. 2000) (holding that Colorado's classification of inmate Chambers as a sex offender, combined with a reduction in good time credits if he did not participate in sex offender treatment, implicated a state-created liberty interest); *but c.f. Grennier v. Frank*, 453 F.3d 442 (7th Cir. 2006) (holding in context of state-created liberty interests that the stigmatization of being called a sex offender and being denied parole on that basis did not implicate due process where Wisconsin's discretionary parole system lacked any "mandatory language" to create a liberty or property interest in an opportunity to be released on parole).

> b. *The Due Process Clause Confers a Liberty Interest Requiring*
> *Procedural Protections Before Labeling a Prisoner as a Sex*
> *Offender and Subjecting that Prisoner to Mandatory Behavioral*
> *Modification Treatment*

Harper claims that "labeling [him] – who was never convicted of a sex offense or accused of any sexual wrongdoing during his incarceration – as a sex offender and then requiring that he enroll in a treatment program as a condition of parole impinges upon a liberty interest protected by the Due Process Clause." (ECF No. 67, PageID.486).

The Supreme Court has articulated two separate inquires for determining whether a prisoner has alleged a protected liberty interest, either one created directly by the Due Process Clause itself, or indirectly as a state created right. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Kirby*, 195 F.3d at 1291; *Renchenski*, 622 F.3d at 325 (3d Cir. 2010); *Chambers*, 205 F.3d at 1242. First, an independent federal constitutional liberty interest is implicated when a change in the prisoner's conditions of confinement essentially "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Sandin*, 515 U.S. at 484 (citing as examples *Vitek*, 445 U.S. at 492-93 (transfer to mental hospital), and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)). Second, "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause," but such interests "will be generally limited to freedom from restraint which … imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84 (citations omitted); *see Wolff v. McDonnell*,

418 U.S. 539, 558 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process).[18]

Notably, in discussing liberty interests directly implicated by the Due Process Clause, the Supreme Court in *Sandin* cited to its decision in *Vitek* for the proposition that in "certain situations" where a state action has "stigmatizing consequences" for a prisoner *and* results in a "punishment" that is "qualitatively different" from that "characteristically suffered by a person convicted of crime," the "Due Process Clause itself confers a liberty interest." *Sandin*, 515 U.S. at 479 n.4. In other words, a stigmatizing classification, standing alone, is insufficient; procedural due process claimants must establish stigma, *in addition to qualitatively different conditions of confinement*, to claim an unconstitutional infringement of a liberty interest. *See Vitek*, 445 U.S. at 494 ("[T]he stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, *coupled with the subjection of the prisoner to mandatory behavioral modification as a treatment for mental illness*, constitute the kind of deprivations of liberty that requires procedural protections.") (emphasis added).

A majority of circuit courts have followed suit and held the same. *See Renchenski*, 622 F.3d at 327 ("[L]abeling a prisoner a sex offender *and forcing him or her to submit to intensive therapy* triggers a liberty interest") (emphasis added); *Neal*, 131 F.3d at 830 ("[T]he stigmatizing consequences of the attachment of the 'sex offender' label *coupled*

---

[18] At oral argument on April 27, 2022, Harper's counsel clarified that his Fourteenth Amendment claim concerns an independent federal constitutional liberty interest arising from the Due Process Clause itself, not a state-created liberty interest.

*with the subjection of the targeted inmate to a mandatory treatment program* … created the kind of deprivations of liberty that require procedural protections.") (emphasis added); *Coleman v. Dretke* ("*Coleman II*"), 409 F.3d 665, 669 (5th Cir. 2005) ("*Vitek* imposed an obligation on the state to provide process before imposing stigmatizing classifications *and concomitant behavior modification therapy* on individuals in their custody.") (emphasis added).

Based on all of the above, this Court also finds that "the Due Process Clause itself confers a liberty interest" requiring procedural protections where a state action has "stigmatizing consequences" for a prisoner and results in a punishment that is "qualitatively different" from that "characteristically suffered by a person convicted of crime." *Vitek*, 445 U.S. at 493-94; *see Sandin*, 515 U.S. at 479 n.4, 484. *Vitek* teaches that while "[a] criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, [] they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections." *Vitek*, 445 U.S. at 493-94. Applying this principle to the present case, Harper's conviction and prison sentence for a non-sex offense do not authorize the MDOC to classify him as a sex offender and to subject him to mandatory sex offender treatment without first affording him additional due process protections. Thus, ultimately, the salient question is whether Defendants subjected Harper to both the stigmatization of being labeled as a sex offender *and* compelled behavioral modification therapy in the form of MSOP. If so, Harper was entitled to "minimum requirements of procedural due process." *Vitek*, 445 U.S. at 491, 494-95. Because the

matter comes before the Court on Harper's summary judgment motion, though, the real question is whether he can demonstrate both of those facts to such a degree that "no reasonable trier of fact could find other than for [him]." *Calderone*, 799 F.2d at 259.

For the reasons discussed below, the Court finds that, even viewing the evidence in the light most favorable to Defendants and drawing all reasonable inferences in their favor, there is no dispute that Harper was sufficiently labeled as a sex offender, or a "possible" sex offender, for purposes of stigmatization. Nonetheless, when viewing the current record (which does not include a full discovery period) and drawing all reasonable inferences in the light most favorable to Defendants, there exist questions of material fact as to whether Harper was subjected to *mandatory* MSOP treatment such that his refusal to participate rendered him ineligible for parole. While Harper has pointed to relevant evidence strongly indicating that his refusal to participate in MSOP played *at least* a part in the denial of his parole, and ultimately may be able to establish such facts – perhaps even on a renewed motion for summary judgment following completion of discovery – *at this stage of the proceedings*, the Court simply cannot say that no reasonable juror could find other than that a recommendation for MSOP constitutes mandatory participation to be eligible for parole. *Calderone*, 799 F.2d at 259. Harper's instant motion for summary judgment should be denied because it would be "inappropriate [to grant that relief] when the evidence is susceptible of different interpretations or inference by the trier of fact." *Harris*, 2006 WL 1313863, at *3 (quoting *Hunt*, 526 U.S. at 553).

       i.   <u>There is no genuine dispute that Harper was labeled as a</u>
             <u>"sex offender" for purposes of stigmatization</u>

Harper argues that "[s]ubjecting [him] to sex offender programming during which he must confess to sex offenses is tantamount to calling him a sex offender and is plainly sufficient to stigmatize him."  (ECF No. 67, PageID.479).  He further contends that Defendants "stigmatized [him] as a sex offender in the course of transferring him, forcing him to live in a unit for sex offenders, requiring him to admit responsibility for a sex offense he never committed and in changing his prison status to require participation in sex offender programming."  (ECF No. 67, PageID.486).

In response, Defendants argue that, viewing the record in the light most favorable to them, they "did not label Plaintiff as a 'sex offender,' nor did they violate any protected liberty interest of the Plaintiff by recommending that he participate in MSOP."  (ECF No. 92, PageID.870).  They contend that "[u]nlike the cases relied on by [Harper], there is no 'sex offender' classification within the MDOC," and there is otherwise "no evidence that the Defendants classified [him] as a 'sex offender' or ever used the term 'sex offender' to describe [him]."  (ECF No. 92, PageID.867).  Harper replies that, while the MDOC may have no formal "sex offender" classification, "Defendants are willing to admit that there is a [designated] sex offender unit at [IBC] for inmates (like Harper) who they have targeted as needing sex offender treatment."  (ECF No. 93, PageID.1066).

Here, Defendants' reliance on the lack of a formal "sex offender" classification within the MDOC places form over substance and lacks merit.  As an initial matter, such argument acknowledges that even MDOC inmates serving sentences for actual sex crime

convictions are not "formally" labeled "sex offenders."  The record reflects that, like Harper, sex offenders are instead "officially" classified by some level of assaultive risk score and then "recommended" to MSOP.  Thus, the salient question for stigmatization purposes is whether the MDOC *effectively* labeled Harper as a sex offender, even if it did not use that specific verbiage.

Even viewing the record in the light most favorable to Defendants, there is no dispute that the MDOC considered Harper to be a sex offender, or at least a "possible" sex offender.  To start, Harper was assessed as a "High Assault Risk" based on Egbuchulam's express finding that Harper had a "Crime Description Fits [] Sex Assault."  (ECF No. 92, PageID.1038; ECF No. 46-2, PageID.293).[19]  Harper was then screened and evaluated using specific risk assessment tools "designed for use with adult male **sex offenders**," which are not used "unless there is some indication of **prior** sexually problematic behavior."  (ECF No. 77-2, PageID.707, 726; ECF No. 92, PageID.890 (emphasis added)).  While Defendants assert that "a person can be determined to be at risk for future problematic sexual behaviors without a determination that they have ever committed a sex offense," they present no evidence of a single prisoner who was classified as a "High Assaultive Risk," screened using Static-99-R or Stable-2007, and recommended for MSOP *without* a finding that the "Crime Description Fits [] Sex Assault," much less without some

_____

[19] The Assaultive Risk Screening Sheet reflects a flow chart, where the first step is answering whether the "Crime Description Fits Robbery, Sex Assault or Murder."  (ECF No. 92, PageID.1038).  If the answer to that question was "No," then Harper could not have been classified as a High Assaultive Risk.  At most, he would have been classified as a "Middle Asslt. Risk," if not a "Low Asslt. Risk."  (*Id.*).

*prior history* of sexual offending.

Moreover, Defendants' assertion that they never "used the term 'sex offender' to describe [Harper]" is belied by their own investigation into Harper's grievance against Thompson, which found that she *admitted* to calling Harper a "sex offender." (ECF No. 1, PageID.24 ("During my investigation [] I interviewed PC Thompson and *she stated she did say Harper is a sex offender and all sex offenders are housed in housing unit 6.*" (emphasis added)). MDOC documents also confirm that certain housing units are specifically designated as "MSOP Units" for the purpose of housing "all sex offenders." (*See, e.g.*, ECF No. 1, PageID.24 (grievance investigation stating, "all sex offenders are housed in housing unit 6"; ECF No. 92, PageID.1043 (Kissinger's declaration that, at STF, "Units L, M, N, and P were the only *MSOP Units*" (emphasis added))).

In addition, the MDOC website's description of the MSOP is revealing. For instance, it states that the MSOP's mission is to provide "sex offender treatment" to "offenders with current sex offense convictions" (*i.e.*, *convicted* sex offenders) or offenders with "histories of sexual offending" (*i.e.*, *possible* sex offenders). (ECF No. 93-5, PageID.1089). It also states that the "central importance" of MSOP is to decrease the risk of "sexual *re-offense*" through the use of assessment tools "***developed specifically for sex offenders***." (*Id.*) (emphasis added). The MSOP also "anticipates that ***sex offenders*** who complete treatment will be better equipped for healthier functioning lives … [and] thus less likely to ***reoffend*** and create ***new victims***." (*Id.*) (emphasis added). Even viewed in the light most favorable to Defendants, there is no dispute that the MSOP exists to treat convicted sex offenders, or possible sex offenders who were not convicted of a sexual

offense but have "histories of sexual offending" in order to prevent "re-offense." As stated in *Renchenski*, this Court can "discern no difference for stigmatization purposes between being labeled a sex offender and being labeled a possible sex offender." *See Renchenski*, 622 F.3d at 328 (rejecting defendants' argument that Renchenski was not labeled a sex offender but instead "designated a 'possible sex offender' [and] recommended to be assessed to determine whether he would benefit from participation in the SOTP").

Finally, although Harper was not required "to wear any different clothes," Defendants' contention that they did not otherwise "require" him to "be identified differently than other inmates, share his program recommendations with other inmates, or treat him differently because of his recommendation for MSOP" misses the mark. The record reflects that, in practice, Harper was both "treated" and "identified" differently than non-sex offenders by his transfer and placement into a specific "sex unit" at IBC for the purpose of taking MSOP, which in turn effectively "shared" to the entire prison that he was a sex offender assigned for sex offender treatment. Indeed, there is no dispute that Harper himself was considered and called a "sex offender" by both MDOC employees and non-sex offender inmates alike. (*See, e.g.*, ECF No. 1, PageID.24 (Thompson's admission to calling Harper a "sex offender"); (¶ 22 (Foster's and Arkesteyn's statement that they "correctly classified him as a sex offender for purposes of needing to participate in the MSOP"); ECF No. 92, PageID.967 (daily called a "chomo" by inmates at yard time)).

Thus, the Court finds that, notwithstanding the absence of a formally mandated classification, Defendants' assessment of Harper using tools designed for sex offenders, calling him a "sex offender," assigning him for a treatment program for sex offenders, and

then transferring him to be housed in a sex-offender unit to participate in sex offender treatment sufficiently identified Harper as a sex offender or "possible" sex offender to satisfy the "stigmatizing consequences" prong of his Due Process claim. *See Renchenski*, 622 F.3d at 328; *Coleman II*, 409 F.3d at 668 ("Whether or not Coleman must now list his name on an official roster, by requiring him to attend sex offender therapy, the state labeled him a sex offender—a label which strongly implies that Coleman has been convicted of a sex offense and which can undoubtedly cause 'adverse social consequences.'").[20]  Even viewing the evidence in the light most favorable to Defendants, no reasonable trier of fact could find otherwise.

    ii.   <u>Harper fails to meet his high burden of showing that no reasonable juror could find other than that a recommendation for MSOP constitutes mandatory participation to be eligible for parole release</u>

As discussed above, *see supra* at 29-35, a stigmatizing classification, standing alone, is insufficient to establish a procedural due process violation; rather, procedural due process claimants must establish stigma, *in addition to qualitatively different conditions*, to claim an unconstitutional infringement of a liberty interest.  *See Vitek*, 445 U.S. at 494; *see also Renchenski*, 622 F.3d at 326; *Neal*, 131 F.3d at 829–30; *Coleman I*, 395 F.3d at

---

[20] The cases Defendants rely on do not alter the analysis.  For example, *Kramer v. Donald*, 286 F. App'x 674, 676-67 (11th Cir. 2008), addressed a narrow issue of whether a parole board's precondition to complete sex offender counseling, standing alone, was "[]sufficiently stigmatizing" to support a procedural due process claim.  Moreover, none of the cases in *Grennier*, *Toney v. Owens,* 779 F.3d 330 (5th Cir. 2015), or *Hernandez v. Washington*, No. 16-10854, 2017 WL 1214436 (E.D. Mich. Jan. 20, 2017), *report and recommendation adopted*, No. 16-10854, 2017 WL 1130090 (E.D. Mich. Mar. 27, 2017), had to address an issue as to whether an inmate was sufficiently classified as a sex offender for stigmatization purposes, much less whether one can be sufficiently stigmatized by being informally labeled as such in practice.

223.  Harper contends that he satisfies this prong of his Due Process claim because, as a result of his sex offender classification, he was compelled to participate in mandatory behavioral modification therapy in the form of MSOP.

As a preliminary matter, the parties do not dispute that the MSOP constitutes invasive behavioral modification treatment.  (*See*, *e.g.*, ECF No. 92, PageID.871 (Defendants noting "[t]he fact that MSOP involves behavior modification")).  In any event, the MDOC's website reflects that "Prisoners who enter the [MSOP] will learn different techniques in programming *to alter thinking and behaviors* so they can live in a healthy lifestyle upon reentry into society," and requires at least 25 sessions.  (ECF No. 93-5, PageID.1089; ¶28);[21] *see also Neal*, 131 F.3d at 822 (assignment to "a twenty-five session psychoeducational treatment program").

Rather, the dispute in this case centers on whether Harper was "mandated" to participate in the MSOP.  As discussed above, a majority of circuit courts have held that inmates who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from a sex offender classification *coupled with certain conditions.  See Renchenski*, 622 F.3d at 326; *see also Neal*, 131 F.3d at 829–30; *Coleman I*, 395 F.3d at 223.  Importantly, courts have considered the link between a prisoner's participation in a sex offender treatment program and his receipt of benefits, such as parole or good time credits, in determining whether it was compulsory.  *See, e.g., Neal*, 131 F.3d

---

[21] Harper's "High" risk assessment score also appears to result in a recommendation of "250-300+ hours, with at least 9-18 months of clinician-led Sex Offender Therapy."  (ECF No. 93-5, PageID.1089).

at 829-30 (holding a state must provide a hearing before classifying a prisoner as a sex offender and requiring the prisoner to complete a treatment program before being eligible for parole); *Coleman I*, 395 F.3d at 223 (holding federal liberty interest in "freedom from the stigma and compelled treatment on which his parole was conditioned").  Moreover, federal courts have held to this rule notwithstanding the representation of prison officials that participation in sex offender treatment is "voluntary."  *See, e.g., Renchenski*, 6232 F.3d at 330 ("[W]e find no material difference between an inmate refusing to participate in sex offender treatment and a prisoner seeking to forestall transfer to avoid participation in mental health therapy.  Unless both plaintiffs are physically dragged to therapy, both 'voluntarily' refuse to participate."); *Neal*, 131 F.3d at 829 (stating that, while the treatment program is "*voluntary*, and the inmate can quit at any time," the fact that an inmate is rendered "*completely ineligible* for parole" without successful completion "has a practical and inevitable coercive effect on the inmate's conduct … functionally equivalent to the psychiatric treatment" required in *Vitek*) (emphasis in original).  Thus, instead of relying on such characterizations, courts have looked to whether significant negative consequences flowed from a failure to participate in "recommended" treatment programs.

Harper primarily contends that "Defendants cannot assert in good faith that subjecting [him] to sex offender treatment is merely a 'recommendation'" for two reasons: (1) he was "involuntarily transferred to a designated sex offender unit at [IBC] for sex offender therapy – which is akin to the transfer to a mental institution at issue in *Vitek*"; and (2) "[o]nce 'recommended' for treatment, MSOP therapy is mandatory if the inmate

desires to be released on parole." (ECF No. 93, PageID.1071).[22]  For the reasons discussed below, Harper has failed at this stage to meet his "substantially higher hurdle" of showing that the evidence so clearly establishes that his completion of MSOP at IBC was a *mandatory condition* of his being paroled that "no reasonable trier of fact could find other than for [him]" on that issue. *Arnett*, 281 F.3d at 561; *Calderone*, 799 F.2d at 259.

### 1.  Involuntary Transfer

Here, the parties agree that Harper was transferred to IBC in June 2018 and involuntarily placed in the MSOP unit until at least November 22, 2018.[23]  To the extent Harper characterizes *Vitek* as holding that the involuntary transfer to a sex offender unit at IBC – by itself – violates his procedural due process rights, that argument lacks merit. *Vitek* did not address the issue of transfers between facilities, institutions, or housing units within the Department of Corrections. *Vitek*, 445 U.S. at 483 (stating that Nebraska Rev.

---

[22] To the extent that Harper contends that his subjection to "risk assessment tools" in the form of Static-99-R and Stable-2007 constitute qualitatively different conditions for purposes of his procedural due process claim, such argument is unpersuasive. *See, e.g.*, *Toney*, 779 F.3d at 341 ("[W]e conclude that Toney's participation in the *Static 99 Assessment* did not constitute sex offender treatment. ... We hold that such a brief, perfunctory evaluation is not so 'stigmatizing and invasive' as to render Toney's conditions of incarceration 'qualitatively different' from those of other inmates.") (emphasis added).  As to his Stable-2007, Harper testified that "Mr. Tolsma never told me ... that this was a SORA evaluation.  He only said, 'Mr. Harper, the parole board sen[t] me an email stating that they wanted a psychological evaluation of you.'  And not once did he say, 'This is a SORA evaluation.'  But had he said that, I would have declined, as I mentioned earlier." (ECF No. 92, PageID.1002).  Viewing this testimony in the light most favorable to Defendants, a reasonable juror could conclude that the MDOC's mere use of the Static-99-R and Stable-2007 does not constitute a condition "qualitatively different" than those "suffered by a person convicted of crime," *Sandin*, 515 U.S. at 479 n.4, and that Harper voluntarily submitted to the assessments.

[23] Defendants present evidence reflecting that he was placed in the MSOP unit at IBC on July 3, 2018, and transferred to a non-MSOP unit at IBC on November 22, 2018. (ECF No. 77-2, PageID.708).  While Harper alleges in his operative complaint that he was in the MSOP unit at IBC for approximately one year, his counsel represented during oral argument on April 27, 2022, that he was unsure about the exact duration of time.

Stat. § 83-176(2) (1976) "authorizes the Direct of Correctional Services to designate any available, suitable, and appropriate residence facility or institution as a place of confinement for any state prisoner and *to transfer a prisoner from one place of confinement to another*.") (emphasis added). Instead, *Vitek* addressed a challenge to Nebraska Rev. Stat. § 83-180(1), which provided that, upon a medical opinion that an inmate "cannot be given proper treatment" at the *prison*, the Director of Correctional Services can transfer the inmate to *a mental hospital*. *Vitek*, 445 U.S. at 483-84 ("Any prisoner so transferred to a mental hospital is *to be returned to the Department* if, prior to the expiration of his sentence, treatment is no longer necessary.") (emphasis added). Indeed, as part of his requested relief, the plaintiff in *Vitek* sought an injunction against "further transfer to [*the mental hospital*]" from his current residence at "*the psychiatric ward of the penal complex*," but notably did not raise any challenge to his placement in the "psychiatric ward" within the prison itself. *Id.* at 485 (emphasis added). Even if *Vitek* could be read to broadly encompass transfers between specific housing units within a prison, the Supreme Court made clear that "the stigmatizing consequences of a transfer ... for involuntary psychiatric treatment" itself is not enough to support a due process claim, but that such a transfer must be "***coupled with*** the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness." *Id.* at 493 (emphasis added). The Sixth Circuit – *in this very case* – applied this reasoning when it held that Harper alleged sufficient factual matter at the dismissal stage to support a plausible claim that it is "the stigmatizing consequences of being labeled a sex offender, ***when coupled with mandated behavioral modification therapy***, [that] constitute[s] the kind of deprivation of liberty that requires procedural

45

protections." *Harper*, 2020 WL 4877518, at *3 (emphasis added).

To the extent Harper argues that his involuntary transfer to the MSOP unit at IBC reflects that a "recommendation" for MSOP was, in fact, a mandatory requirement, he similarly fails to meet his "substantially higher hurdle" of showing that "no reasonable trier of fact could find other than for [him]." *Arnett*, 281 F.3d at 561; *Calderone*, 799 F.2d at 259. Viewing the evidence in the light most favorable to Defendants, the record reflects that, despite being recommended for MSOP for approximately four years between March 2018 and March 15, 2022, during which he had been transferred between at least four separate MDOC facilities (MCF, IBC, SLF/STF, JCF), Harper was placed in a specific "MSOP unit" at only one facility for a single, isolated period of time and was never again placed in a MSOP unit upon "termination" from the program for declining to participate.

Specifically, Harper alleges that "[a]pproximately two months after [he] met with [] Egbuchulam, he was transferred to [MCF] where the [MSOP] is conducted" (¶18; *see also* ECF No. 92, PageID.926). But despite his being recommended for MSOP, Harper has not shown that he was placed in a MSOP unit at MCF, nor that he was placed in a MSOP unit at SLF, STF, or JCF. Instead, Harper can point to only one period of several months between July 2018 through November 2018 at IBC where he was placed in a MSOP unit. And, even during that period of time, there exist several questions of material fact that bear on the alleged coerciveness of a recommendation for MSOP.

For example, while Harper alleges that he has always refused to participate in the MSOP, both MDOC documents and Harper's testimony reflect that he participated for at least one day during the "first phase of the MSOP," *i.e.*, the TRY program. (ECF No. 92,

PageID.952-53; ECF No. 77-2, PageID.763).  Harper offers no explanation as to how or why he ended up participating in the TRY program, which is significant because, had he refused to participate in MSOP to any extent but was nonetheless dragged or somehow forced into participating in the TRY program, that would strongly support "compulsion." Harper does not assert, much less present evidence that, he was forced into participating in day one of the TRY program.[24]  Rather, Harper's testimony reflects that, once he "couldn't [handle the TRY program] no more," he was terminated for declining to participate and subsequently transferred out of the MSOP unit.  (ECF No. 92, PageID.962, 964).

While Harper takes issue with the fact that Defendants did not "immediately" transfer him out of the MSOP unit upon his termination from the program on August 30, 2018, and suggests this delay was an effort to "break" his resolve in refusing to participate, such an assertion is speculative.  (ECF No. 92, PageID.955).  Moreover, Defendants' evidence reflects that Harper was transferred into a non-MSOP unit at IBC on November

---

[24] In addressing his Fifth Amendment claim in his supplemental reply brief, Harper attaches MDOC records in a different case, *Snead v. Kissinger, et al.*, No. 14-cv-01110 (W.D. Mich.). (ECF No. 93-7, PageID.1095-1103).  Among those records, a prisoner grievance by inmate Bobby Snead in November 2013 reflects Snead complaining that "Since 'TRY' Program is an *introductory* program and *not the main* sex offender program, I should be allowed to participate in the 'TRY' program and then decide if I have a problem that requires treatment.  The group is supposed to be *voluntary*, yet I was kicked out for saying something Counselor Perry didn't agree with."  (*Id.*, PageID.1099) (emphasis added).  Viewing this document in the light most favorable to Defendants, and coupled with the other evidence discussed herein, a reasonable juror could conclude that the TRY program was "voluntary" (in which case Harper would have voluntarily participated his first day) or was not part of the "main" MSOP (in which case Harper would have been terminated from MSOP without ever having been forced to participate in sex offender treatment).

22, 2018.[25]  (ECF No. 77-2, PageID.708).  This date of transfer is significant when viewed together with Harper's "Therapy Non-Admission Report," which reflects that "Prisoners who are not admitted to this program when first assessed may be reassessed, but only upon direct request in writing by the prisoner," and that "Harper may kite for reconsideration in *3 months*" if he decides that he wants to participate in MSOP.  (ECF No. 77-2, PageID.763) (emphasis added).  In other words, the fact that Harper was transferred out of the MSOP unit at IBC on November 22, 2018, *before* the 3-month waiting period for eligibility for reconsideration had fully lapsed on November 30th, is inconsistent with Harper's contention that he was kept in the MSOP unit to "break" him into participating.  Harper also has not shown that a transfer in less than 3 months after termination from the MSOP was not a timely or even speedy transfer by the MDOC's administrative standards.  Finally, the current record reflects that Harper was never again placed in a MSOP unit upon his official termination from the program.

In short, viewing the evidence and drawing all reasonable inferences in the light most favorable to Defendants, Harper has failed to meet his substantially higher burden to show that no reasonable juror could conclude other than that the MSOP was "mandatory" based on his single instance of being placed in a MSOP unit at IBC.  While the Court has no quarrels with Harper's position that "[c]onfinement to such a specialized unit involves more than merely a loss of freedom; it also has a stigmatizing effect on the prison inmate" (¶45), again, Supreme Court precedent, and the Sixth Circuit's ruling in this very case,

---

[25] Harper fails to provide an exact date for his transfer out of the MSOP unit.  Instead, he asserted during oral argument that the "important point" was that he "wanted out immediately."

teach that the stigmatizing effect alone is insufficient to constitute a deprivation of liberty that requires procedural protections. *Vitek*, 445 U.S. at 493; *Harper*, 2020 WL 4877518, at *3. This does not mean Harper's involuntary placement in the MSOP unit at IBC has no bearing on the alleged coerciveness of a recommendation for MSOP, but only that Harper has failed to show at this stage that no reasonable juror looking at the current record could conclude other than that the MSOP was mandatory based on his transfer to the MSOP unit at IBC.

### 2. Ineligibility for Parole

Harper's final avenue for attempting to establish that the MSOP was "mandatory" as to him is his contention that he was denied parole because he refused to participate in the program. Specifically, Harper argues that "requiring that he enroll in a treatment program as a condition of parole impinges upon a liberty interest protected by the Due Process Clause." (ECF No. 67, PageID.486). He contends that "Defendants have misleadingly employed the word 'recommendation' throughout this litigation. Once 'recommended' for treatment, MSOP therapy is mandatory if the inmate desires to be released on parole." (ECF No. 93, PageID.1071; *see also id.*, PageID.1073 ("Once recommended, MSOP treatment is mandatory"); ECF No. 67, PageID.475 ("as a consequence of refusing to participate in sex offender therapy programming, [he] has been deemed ineligible for parole."). Thus, the salient question here is whether Harper has sufficiently shown that his eligibility for parole was conditioned on his participation in MSOP, such that no reasonable juror could conclude other than that his participation in MSOP was a requisite condition of parole release. For the reasons discussed below, while

Harper has presented some strong evidence in his favor on this point, ultimately, he fails at this point in the proceedings to satisfy this "substantially higher hurdle" required to obtain an award of summary judgment in his favor.

To begin with, Harper attests in his verified operative complaint that:

> After being denied Parole in 2020, Plaintiff again refused to participate in MSOP.  Plaintiff was denied parole for a second time on February 23, 2021, which followed an interview with Parole Board member Anthony King, who expressed doubts to Plaintiff about his fitness for release without participating in sex offender therapy programming. *This was because the Parole Board employs an unwritten policy of denying parole to inmates who refuse to take "recommended" sex offender therapy classes.*

(¶38) (emphasis added).  But Harper does not support his conclusory assertion about an alleged "unwritten policy" with any evidence of inmates who had been similarly denied parole for refusing to take recommended MSOP treatment.  Thus, this particular "evidence" is of no utility to Harper meeting his burden of proof.

Next, Harper argues that his "refusal to participate in MSOP was <u>a reason</u> for his first denial and it was <u>the reason</u> for his second" (ECF No. 93, PageID.1070) (emphasis in original), based on an affidavit supplied by Defendants from Parole Board Chairman Shipman, in which he attests as follows:

> The Michigan Parole Board has twice considered Harper for parole. The first time, on March 3, 2020, the board decided to continue Harper's prison sentence because he had received misconduct tickets that resulted in a security reclassification, and ***he had not completed his recommended sexual offender programming***. … The second time the parole board considered Harper for parole, on February 23, 2021, it decided again to continue his prison sentence ***because he had not yet completed his recommended sex offender programming.***   This decision was made with a video interview of Harper and updated sex

offender risk assessment (SORA); Harper's parole guidelines score average at -10.

(ECF No. 77-2, PageID.709) (emphasis added).  While this affidavit indicates that Harper's failure to complete MSOP was a factor in the denial of his parole, it reflects that these denials were based on other factors as well, *i.e.*, misconduct tickets for the first decision, and an interview of Harper, updated SORA, and -10 parole guidelines score for the second decision.  (*Id.*).

But, even viewing in isolation the portion of the affidavit most favorable to Harper – that the Parole Board "decided again to continue his prison sentence because he had not yet completed his recommended sex offender programming," the Court would still not find that the entire record is so clear on that point that "no reasonable trier of fact could find other than for [Harper]."  *Calderone*, 799 F.2d at 259.  First, the Court notes that neither of the official Parole Board Notices of Decision concerning Harper's first denial dated March 9, 2020, or his second denial dated February 23, 2021, list Harper's refusal to participate in MSOP as a specific reason for denial of parole.  (ECF No. 77-2, PageID.765-69).  To the contrary, these notices expressly specify a handful of "Reasons in Support of Parole Board Action," none of which are related to the MSOP, including: (1) Harper's "property crime" (*i.e.*, his convictions for home invasion and domestic violence) was "associated with violence," "[i]nvolved the presence of a weapon(s)," "[i]nvolved the breaking and entering [of an] occupied dwelling," and "involved the taking of or possession of the property of another"; (2) "Regarding the [property] crime, it is [the Parole Board's] belief [that Harper] minimizes [his] responsibility"; and (3) Harper "has a criminal history"

51

involving "weapon or weapons" and of "violent misdemeanors," "felony assaultive crime(s)," and "traffic related misdemeanors."  (ECF No. 77-2, PageID.765, 768).  (*Id.*). The only reference to the MSOP from these notices appears to be a statement concerning Harper's second parole decision under "***Recommendations*** For Corrective Action Which May Facilitate Release" that Harper "[c]omply with any recommendation for psychological screening and/or therapeutic programming when referred."   (*Id.*, PageID.769) (emphasis added).   Even in that regard, these notices also recommend additional corrective actions that appear unrelated to MSOP, such as: "Demonstrate responsible behavior by earning positive reports in any programs you may be involved in"; "Demonstrate responsible behavior by avoiding situations which result in misconduct citations"; "Provide additional demonstration of positive prison behavior during the period of continuance"; and "Identify and develop community resources to address special needs through group therapy." (*Id.*, PageID.766, 769).

Second, Harper has not shown that he would not have been denied parole even after successfully taking one or all of these other suggested corrective actions, much less that any such a denial would be because he still failed to participate in MSOP.   (*Id.*).

Finally, both notices make clear that "Completion Does Not Guarantee A Positive Action," which indicates that even if Harper had successfully completed MSOP, he still may not have been granted parole.  (*Id.*).

In short, Harper has not shown that no reasonable juror could conclude from the above evidence that he was denied parole for reasons other than his refusal to participate in MSOP.  Or, put another way, he has not shown that any reasonable juror would have to

conclude that MSOP was a *mandatory condition* of parole release, as opposed to a suggested corrective action that would *help* his chances at parole.  Summary judgment in favor of Harper as the plaintiff on his own summary judgment motion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Harris*, 2006 WL 1313863, at *3 (quoting *Hunt*, 526 U.S. at 553).

It is also worth noting that there is no dispute that Harper has now been considered for parole three times.  While Harper contends that Defendants are "merely splitting hairs" on this point (ECF No. 93, PageID.1072), the fact that Harper was considered for parole can be relevant to determining whether his participation in MSOP was a condition of his parole eligibility.[26]  Specifically, depending on the circumstances surrounding each parole hearing, a reasonable juror could conclude that, if participation in MSOP was a requisite condition of parole, Harper would not have even been considered for parole release, much less given a parole board interview and sent for additional evaluation before the second decision, until and unless he started participating in MSOP.[27]  Indeed, the MDOC's Notice of Intent to Conduct a Parole Board Interview (which Harper received prior to his second parole board decision) reflects that the Parole Board considered a host of different factors

---

[26] To the extent Defendants argue that Harper's parole consideration necessarily shows that he was not "mandated" to complete the MSOP (ECF No. 92, PageID.874), such an argument is misguided. Regardless of nominal labels, if Harper can show that his refusal to participate in MSOP is, in effect, a requisite condition of parole release, the Court can discern no material difference for parole eligibility purposes between requiring an inmate to participate in sex offender treatment as a prerequisite for being *considered* for parole or for being *granted* parole.

[27] Harper argues that "[a]ccording to Michigan law, all inmates in Harper's situation become 'subject to the jurisdiction of the parole board.' MCL 791.234," (ECF No. 93, PageID.1062), but he has not shown that the Parole Board's handling of Harper's parole decision in this case was the bare minimum required by law and not an exercise of its discretionary authority.

in its decision, including statistical risk, the crimes for which Harper is now serving, prior crimes, pending charges, institutional conduct, institutional program performance, employment history and/or readiness for employment, physical condition, mental health and psychiatric history, parole plans, readiness to accept responsibility for actions, and any prior Parole Board actions – most of which would be unnecessary to consider if his refusal to participate in MSOP was dispositive.  (ECF No. 92, PageID.1040; *see also* PageID.1048 (Shipman's affidavit attesting that "[t]he parole release decision is not bound by program completion, but rather an overall review of all of the facts and circumstances, including the prisoner's mental and social attitude").

Finally, Shipman attests that "the Parole Board can and does parole prisoners who have been recommended for but have not completed sex offender specific programming prior to release from a correctional facility."  (ECF No. 92, PageID.1048).  While Harper counters that Shipman "misleadingly omits ... that those inmates are required to complete their sex offender programming in an outside setting and under the auspices of their parole officers," Harper cites to a MDOC website that no longer appears to be available, and his accompanying parenthetical ("[Parole Officer Jim] Olson, who has studied the dynamics of sex offender on his own, also meets routinely with the clinician at the facility the MDOC contracts with to provide sex offender therapy to those he supervises") at most shows that *some* sex offender inmates released on parole before completing recommended MSOP participate in sex offender therapy in free society, but fails to provide sufficient details to draw any sort of meaningful conclusion from this one way or the other.  (ECF No. 93, PageID.1071 n.3).  Moreover, viewing this evidence and drawing all reasonable inferences

in the light most favorable to Defendants, it does not show that the above applies to *all* similar inmates.

As a final point, the Court does not disagree with Harper's argument that it "is the 'refusal' by an inmate that makes all the difference," and that Shipman failed to attest "inmates like Harper who 'refuse' recommended sex offender treatment are released on parole." (ECF No. 93, PageID.1071).  But on *his* motion for summary judgment as the plaintiff, it is *Harper* who bears the "substantially higher hurdle" to provide evidence such that no reasonable juror could conclude that all inmates who refuse recommended sex offender treatment are ineligible to be released on parole.  At least at this stage, he fails to sufficiently do so.

In sum, viewing the evidence and drawing all reasonable inferences in the light most favorable to Defendants, Harper fails to show that no reasonable juror could conclude other than that his participation in MSOP is a requisite condition of parole release, such that a recommendation for MSOP constitutes mandatory treatment.   Accordingly, Harper's motion should be denied as to his procedural due process claim.[28]

---

[28] Because the Court recommends, for the reasons stated above, that Harper's motion for partial summary judgment be denied as to his procedural due process claim, it need not formally address whether Harper was provided with the minimum procedural protections that would otherwise be required to satisfy his procedural due process rights.

Nonetheless, the Court notes that Harper was never provided the hearing he requested even after the MDOC provided him with its Notice of Risk Classification specifically advising him, "If you believe these statements about your background are inaccurate, you should see your counselor, resident unit manager, or supervisor.  If you are still dissatisfied after that, you may request an administrative hearing pursuant to MCLA 791.251 *et seq* to contest the basis for the classification factors applied."  (ECF No. 46-2, PageID.293).  Regardless of the ultimate constitutionality of Defendants' actions, offering Harper a hearing and then not providing one essentially invited

## 2.   Fourteenth Amendment Substantive Due Process

As discussed above with Harper's procedural due process claim, there remain questions of material fact as to whether his participation in MSOP was a prerequisite to parole release such that a recommendation for MSOP constitutes compelled behavioral modification treatment, which, when coupled with the stigmatization of being classified as a sex offender, violates a liberty interest requiring minimum procedural protections. Should Harper fail to show a violation of a liberty interest under his procedural due process claim, he would consequently fail on his substantive due process claim, as "[t]he interests protected by substantive due process are ... much narrower than those protected by procedural due process." *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003).

---

this litigation.

Defendants' suggestion that an administrative hearing was unnecessary because the sentencing hearing provided an adequate process lacks merit. This argument ignores that Harper was offered an administrative hearing *well after* the sentencing hearing. It also ignores Harper's contention that his ability to object to the PSI at sentencing was insufficient because "the 'action' of classifying [him] in prison based upon a sex offense was never 'proposed' during [his] sentencing hearing," and he otherwise had "no incentive [] to challenge the contents of his PSI at sentencing." (ECF No. 93, PageID.1075); *see Renchenski*, 622 F.3d at 331 ("Because Renchenski was never charged with, nor convicted of, a sex offense, the procedure he was afforded during his trial and conviction for the 1982 murder cannot serve as the sufficient procedural safeguard for Fourteenth Amendment purposes. Nor has he been afforded the opportunity to properly challenge his sex offender classification."); *see also Vitek*, 445 U.S. at 491 ("[T]he minimum requirements of procedural due process … being a matter of federal law … are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action. In *Morrissey*, *Gagnon*, and *Wolff*, the States had adopted their own procedures for determining whether conditions warranting revocation of parole, probation, or good-time credits had occurred; yet we held that those procedures were constitutionally inadequate.").

Finally, as to Defendants' reliance on Harper's parole interview prior to his second parole decision, Defendants do not address his contention that he was entitled to the "administration of the hearing by an independent decision-maker." (ECF No. 67, PageID.487, 494); *see Renchenski*, 622 F.3d at 331; *Vitek*, 445 U.S. at 494-95.

In any event, Harper fails to sufficiently show a violation of his substantive due process rights.

In his motion, Harper argues that "Defendant prison officials decided, after nothing more than a conclusory look at a [PSI] (or prison documents relying upon that [PSI]), that Harper committed what amounts to a sex crime, though he was never convicted of one," they "engaged in this administrative action without providing any procedural safeguards, much less an opportunity to be heard," and "[c]lassifying [him] as a sex offender based upon a conclusory look at a [PSI] represents an example of such arbitrary and capricious action that it is indeed conscience shocking." (ECF No. 67, PageID.489-90).

Defendants respond that the "record does not clearly establish that [they] were 'arbitrary and capricious' in recommending that [Harper] participate in MSOP" based on their use of the "Static-99-R and the MDOC Assaultive Scoring Sheet," and that Harper provides "no basis for this assertion other than denying that information is true." (ECF No. 92, PageID.878). Harper replies that "[t]he facts and circumstances of this case are beyond outrageous" because "[s]ubjecting [him] to the sex offender 'risk tools' at issue here, involuntarily transferring him to a sex offender unit for sex offender therapy, denying him parole for his refusal to take sex offender classes, requiring him to admit to a sex crime that he never committed, and repeatedly denying him his requested hearing constitutes a degree of arbitrariness that warrants a finding that his substantive due process rights were violated." (ECF No. 93, PageID.1077-78).

Substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Guertin v. State*, 912 F.3d 907, 918

(6th Cir. 2019) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  But substantive

due process only "protects those fundamental rights and liberties which are, objectively,

deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered

liberty, such that neither liberty nor justice would exist if they were sacrificed." *Guertin*,

912 F.3d at 918 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).

As an initial matter, Harper does not allege that Defendants' actions have

significantly burdened a "deeply rooted" *fundamental* right such that it would trigger strict

scrutiny.  *See Does v. Munoz*, 507 F.3d 961, 964-66 (6th Cir. 2007) (explaining that

"identifying a new fundamental right subject to the protections of substantive due process

is often an uphill battle, as the list of fundamental rights is short," and applying rational

basis review of substantive due process claim where plaintiff's claim did not state a

violation of a "fundamental right") (quotations and citations omitted); *see also Wash. v.

Glucksberg,* 521 U.S. 702, 720 (1997) (short list of fundamental rights).  Instead, Harper

makes clear in his operative complaint that "Defendants have classified [him] as a sex

offender and subjected him to the MSOP ***without a rational basis***, thus violating [his]

rights to substantive due process of law.  Defendants' actions are arbitrary and capricious

[because] Defendants have ***acted without a rational basis*** and without consideration of the

facts or circumstances of [his] case."  (ECF No. 63, PageID.412-13) (emphasis added).

As the Sixth Circuit explained, "[w]here a substantive due process attack is made

on state *administrative* action, the scope of review by the federal courts is extremely

narrow.  To prevail, a plaintiff must show that the state administrative agency has been

guilty of "arbitrary and capricious action" in the *strict* sense, meaning "that there is no

rational basis for the ... [administrative] decision." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (emphasis in original).  Under this lenient standard, the action must be "rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted)).

Moreover, "[a] plaintiff asserting a substantive due process claim faces a virtually insurmountable uphill struggle.  He must show that the government conduct in question was so reprehensible as to 'shock the conscience' of the court." *Rimmer-Bey v. Brown*, 62 F.3d 789, 791 n.4 (6th Cir. 1995) (citing *Rochin v. California*, 342 U.S. 165 (1952)). "Conduct shocks the conscience if it violates the decencies of civilized conduct." *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)).  For example, the Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendant's conduct shocks the conscience and constitutes an "egregious abuse of governmental power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999); *see also Davis v. Gallagher*, No. 1:16-cv-1405, 2016 WL 7403941, *4 (W.D. Mich. Dec. 22, 2016); *Robinson v. Schertz*, No. 2:07-cv-78, 2007 WL 4454293 (W.D. Mich. Dec. 14, 2007).

Here, while a sex offender label is certainly stigmatizing and the MSOP intrusive, the Supreme Court has stated that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense," and that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 846.  Viewed in the light most favorable

to Defendants, the record shows that, while Harper was not convicted of a sex crime, the PSI included a "description of the offense" with detailed acts of sexual assault.  (ECF No. 73-2, PageID.612).  Based on the PSI, Harper was screened using the Static-99-R (the "most widely used assessment tool" among U.S. correctional professionals), which resulted in an initial risk score of "above average risk of engaging in further sexually abusive behaviors" and subsequently triggered a recommendation for MSOP.  (ECF No. 77-2, PageID.707; ECF No. 92, PageID.888-92).  And, based on that recommendation, Harper was transferred to a MSOP unit for sex offender treatment, was terminated from the program after refusing to participate, and subsequently transferred out to a non-MSOP unit.  When it came time for Harper to be considered for parole, the Parole Board denied his parole upon review of all of the facts and circumstances surrounding Harper, and suggested certain corrective actions that may aid in his release, including participation in recommended programming.

Moreover, even if Defendants may not have provided Harper with the type of hearing he claims was required under the Due Process Clause, the record reflects that Defendants did consider, to a certain extent, his objections and challenges to his classification and recommendation for MSOP in the form of verbal objections, grievances, parole board interviews, and objections to parole board decisions. (¶¶ 13-14, 19-20, 22, 23, 26-27, 37-38; ECF No. 1, PageID.24; ECF No. 92, PageID.952, 1045).

Based on the above, Harper has not shown that these series of events by Defendants constitute "the most egregious official conduct" so as to "shock the conscience." *Lewis*, 523 U.S. at 846.  Nor has he shown that these events were intentionally orchestrated "to

injure in some way unjustifiable by any government interest," as there is no question that the state has a legitimate interest in protecting members of the community from future sex offenses. *Id.*; *see McKune*, 536 U.S. at 33 ("Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism."); *Coleman I*, 395 F.3d at 225. Rather, as detailed above with his procedural due process claim, the real issue stems not necessarily from the validity or correctness of the State's actions, but from the State taking such action without first providing Harper with adequate procedural protections.[29]

Accordingly, Harper's motion for partial summary judgment as to his substantive due process claim should be denied.

### 3. Fifth Amendment Self-Incrimination

When Harper's case was before the Sixth Circuit, that court provided the following discussion of his self-incrimination claim and the relevant and controlling law:

> The Fifth Amendment, as applied to the states through the Fourteenth Amendment, [] provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. While the "privilege against self-incrimination does not terminate at the

---

[29] While Harper's transfer to the "sex unit" to take MSOP, or alleged denial of parole based on his refusal to participate, may have been unfair or in error, such consequences fall far short of *Lewis*'s "shock the conscience" standard. *See Merchant v. Hawk-Sawyer*, 37 F. App'x 143, 146 (6th Cir. 2002) (holding that a prisoner's "21-month confinement in the special housing unit does not give rise to a protected Fourteenth Amendment liberty interest because it is not an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life") (quotation and citation omitted); *see Kikuchi v. Bauman*, 2020 WL 7587156, at *2 (6th Cir. Oct. 22, 2020) ("Without any right to parole, [the inmate] cannot state a claim that the procedures used by the Michigan Parole Board to evaluate him for parole, or the substantive reasons for the denial of parole itself, violated his right to due process) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)). This is particularly true considering that the transfer was the product of the Defendants' reliance on the PSI information and the various statistical risk-scoring tools which are designed to rely on that information. (ECF No. 92, PageID.889-90).

jailhouse door ... [a] broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (Kennedy, J., plurality). The right against self-incrimination applies not only in criminal trials, but whenever the state seeks to compel an individual to be a witness against himself and divulge information that might incriminate that person in future criminal proceedings. *See Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).

The Supreme Court outlined the contours of a prisoner's Fifth Amendment right against self-incrimination in *McKune*, which involved a convicted sex offender's challenge to Kansas's compulsory sex-offender program that required him to admit his crime of incarceration, as well as any other past sex crimes. *McKune*, 536 U.S. at 29. The four-justice plurality stated that "[a] prison clinical rehabilitation program ... does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.* at 37–38. The Court rejected McKune's Fifth Amendment claim because his decision not to participate in Kansas's compulsory sex-offender program would neither extend his term of incarceration nor affect his eligibility for good-time credits or parole, but would merely result in him being transferred "to a less desirable maximum-security unit." *Id.* at 38.

Here, however, Harper alleged that he will be ineligible for parole if he refuses to participate in the Michigan Sex Offender Program. Accepting this allegation as true, as we must at the dismissal stage, *see Doe*, 882 F.3d at 588, such an adverse consequence is precisely the kind that the *McKune* plurality thought would implicate the Fifth Amendment's protections against self-incrimination. *See McKune*, 536 U.S. at 38. Harper's complaint therefore contains sufficient factual matter to support a plausible claim that his Fifth Amendment right against self-incrimination would be violated because he would lose his parole eligibility by refusing to participate in the Michigan Sex Offender Program.

*Harper*, 2020 WL 4877518, at *4 (emphasis added).

In his motion, Harper argues that he is "ineligible for parole because he refuses to

participate in [MSOP]."  (ECF No. 67, PageID.490).  He also argues that, as part of the MSOP, he is "expected to admit past behavior while attending sex offense classes," and that "he identified specific MDOC employees who told him that he must admit to a sex offense as part of his MSOP therapy."  (ECF No. 67, PageID.490; ECF No. 93, PageID.1079; *see also* Harper Dep., ECF No. 92, PageID.950-51 (Q: "Did anyone in 2018 from MSOP tell you or give you any paperwork that said you had to admit you committed a sexual assault that's listed in your PSI?" … A: "Yes, sir.  Ms. [Minnick], Ms. Brookshire, Ms. Thompson.")).

Here, as discussed above, *supra* at 49-55, Harper has not shown at this stage of the proceedings that no reasonable juror can conclude other than that his refusal to participate in MSOP renders him ineligible for parole.  Indeed, while the Sixth Circuit found Harper alleged sufficient factual matter "at the dismissal stage" that "he would lose his parole eligibility by refusing to participate in [MSOP]," on his own motion for summary judgment as the plaintiff, he has not met his substantially higher burden to unquestionably demonstrate that his parole is actually conditioned on MSOP participation.

In any event, Harper also fails to meet his high burden to show that no reasonable juror could conclude from the present record that participation in the MSOP did not require him to admit to committing the sexual assault described in his PSI (or some other prior offense).  In response to Harper's motion, Defendants dispute that the "MSOP requires that he admit that he committed the sexual assaults referenced in his PSI" by presenting evidence that the MSOP only requires him to "develop[] a treatment goal related to sexual self-regulation that is tied to criminal behaviors."  (ECF No. 92, PageID.880; *see also* ECF

No. 92, PageID.895-96 (Kissinger's declaration attesting, ***"[a]n individual does not need to describe their offense or admit to their offense to participate in the TRY program.  [] The clinical portion of the MSOP program [] does not require an admission to all elements included in the PSI***, but does require that an individual develop a treatment goal related to sexual self-regulation that is tied to criminal behaviors.") (emphasis added). Although Harper testified that certain individuals told him that he must admit to the conduct in his PSI, Defendants present conflicting evidence that upon full implementation of the MSOP in 2017, admission to a specific crime or offense is not required.  (*See e.g.*, ECF No. 92, PageID.880, 895-96; ECF No. 99, PageID.1160 ("upon full implementation of the MSOP program, ***an individual was not required to admit to all sexual offending behaviors noted in their pre-sentence report (PSI) and/or police reports***") (emphasis added)).[30]   Finally, despite Harper's challenges to Defendants' evidence and/or their interpretation of such evidence (*see, e.g.*, ECF No. 103, PageID.1306; ECF No. 93, PageID.1079), at this stage, the Court must view all evidence and draw all reasonable inferences in the light most favorable to the Defendants.

In short, the record contains conflicting evidence as to whether the MSOP requires Harper to admit to incriminating information in his PSI and/or some other offense. Accordingly, Harper fails to show that no reasonable juror can conclude other than that the MSOP requires admission of a past offense that may incriminate him in future criminal

---

[30] The same applies to Harper's submission of affidavits from inmate Blake Harrison, who attests that participants in MSOP are required to admit to a sex offense.  (ECF No. 93-8, PageID.1104-06; ECF No. 100, PageID.1269-70).

proceedings, in violation of the Fifth Amendment. Thus, Harper's motion for partial summary judgment should be denied on this claim, as well.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Harper's motion for partial summary judgment **(ECF No. 67)** be **DENIED**.

Dated: June 28, 2022                                s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                            United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C.

§636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 28, 2022.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
